**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| JODI KATZEFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-12022-JEK |
| | ) | |
| TOYOTA OF DARTMOUTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S**
**MOTION TO COMPEL ARBITRATION**

**KOBICK, J.**

Plaintiff Jodi Katzeff filed this putative class action lawsuit, seeking to represent a class of individuals who, like her, received unsolicited telemarketing calls from defendant Toyota of Dartmouth, Inc. Katzeff asserts that these calls violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c), which directs the Federal Communications Commission "to prescribe regulations to protect the privacy of residential telephone subscribers." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 373-74 (2012). The complaint alleges that Toyota violated the national do-not-call registry restrictions and internal do-not-call list procedures under two of those regulations, 47 C.F.R. §§ 64.1200(c) and (d). Pending before the Court is Toyota's motion to compel arbitration. For the reasons that follow, the motion will be granted. Because Toyota has established that it can enforce Katzeff's arbitration agreement with TrueCar, Inc. as a third-party beneficiary, this action will, as Toyota has requested, be stayed pending arbitration.

## BACKGROUND

The following facts are drawn from the complaint and documents submitted in connection with Toyota's motion to compel arbitration. *Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 168 (1st Cir. 2022).

Jodi Katzeff is a Massachusetts resident and the sole user of a residential cellphone, which has a number ending in 0457. ECF 1, ¶¶ 8-9, 27, 37-39. She registered that number with the national do-not-call registry on April 26, 2014. *Id.* ¶ 42.

Toyota of Dartmouth, Inc. is a car dealership in North Dartmouth, Massachusetts that sells and leases new and used Toyota vehicles. *Id.* ¶¶ 3, 10; ECF 12, ¶¶ 3-6. According to its General Manager, Robert Zammito, Toyota pays AutoWeb, Inc. and TrueCar, Inc. in exchange for advertising its vehicles on their websites and receiving the contact information of any consumer who expresses interest in those vehicles. ECF 12, ¶¶ 7-8. Zammito understands that "all consumers who submit sales leads through AutoWeb or TrueCar must affirmatively consent to each site's Terms of Use and/or Terms of Service and consent to be contacted by Toyota of Dartmouth." *Id.* ¶ 8.

On April 18, 2024, Katzeff expressed interest in a 2023 Toyota Camry and provided her cellphone number on AutoWeb's website. *Id.* ¶ 9; ECF 13, ¶ 3. AutoWeb's Senior Vice President of Legal and Compliance, Tatevik Davtyan, avers that Katzeff was "presented with a TCPA consent statement that included a hyperlink to the Company's Terms of Use" and was "required to click a button affirmatively indicating [her] agreement to the Terms of Use, which contained an arbitration provision." ECF 13, ¶¶ 1, 4. Davtyan fails to provide a copy of the relevant website. In her declaration, Katzeff does not contest visiting the website but states that she cannot recall any such disclosure or having "submitted [her] phone number or other personal information." ECF 17-

2

1, ¶¶ 3-5. Based on a screenshot of AutoWeb's website from October 15, 2025, Katzeff attests that she "would not have known that [she] was agreeing to be bound by AutoWeb's Terms of Use or to the arbitration provisions therein," nor would she have "expect[ed] to be bound by an arbitration agreement between [her]self and Toyota." *Id.* ¶¶ 6-8. AutoWeb ultimately supplied Katzeff's number to Toyota that same day, and Toyota subsequently texted her. ECF 12, ¶¶ 9-10; ECF 1, ¶¶ 13, 44. Katzeff initially responded to Toyota's texts. ECF 1, ¶ 13.

Four days later, on April 22, 2024, Katzeff similarly expressed interest in a 2024 Toyota Camry and gave her cellphone number to TrueCar's affinity partner, Farmers Insurance. ECF 12, ¶ 11; ECF 14, ¶ 6. TrueCar's Vice President of Technology, Michael Shindle, attests that Katzeff was presented with the following webpage:



ECF 14, ¶¶ 2, 8. This webpage required Katzeff to check a box indicating that she "accept[ed] TrueCar's Terms of Service and Privacy Policy," both of which were hyperlinked and underlined, in order to click "Next." *Id.* ¶¶ 4-5, 8. It also displayed the following text: "I agree that TrueCar

and its Certified Dealers may communicate with me via email, text, or phone." *Id.* ¶ 8. Katzeff had to accept those terms before she could "submit a lead and request pricing information from [TrueCar's] participating dealers." *Id.* ¶ 5.

Clicking the hyperlinked Terms of Service would have taken Katzeff to a webpage that contained an arbitration agreement in the first section. *Id.* ¶ 9; ECF 14-1, § 1. The substance of the arbitration agreement was further hyperlinked from that section in the Terms of Service. ECF 14, ¶ 9; ECF 14-1, § 1; ECF 14-2. One provision of the arbitration agreement specified:

> You and TrueCar agree that Participating Dealers and Affinity Partners are intended to be third party beneficiaries to this Arbitration Agreement and that the terms of our Agreement will also inure to the benefit of Participating Dealers and Affinity Partners. This means that—in addition to You and TrueCar—Participating Dealers and Affinity Partners will be able to enforce this Agreement in the event of a dispute between You and one of TrueCar's participating Dealers or Affinity Partners.

ECF 14-2, § 5. The term "Participating Dealers" was defined to mean "any new and/or used automobile dealer that participates in the TrueCar network." *Id.* § 7.

Katzeff again does not dispute visiting the Farmers/TrueCar webpage but avers that she cannot remember having "submitted [her] phone number or other personal information." ECF 17-1, ¶¶ 9-10. She also attests that, based on this webform, she "would not have known that [she] was agreeing to be bound by TrueCar's Terms of Use or to the arbitration provisions therein," nor would she have "expect[ed] to be bound by an arbitration agreement between [her]self and Toyota." *Id.* ¶¶ 13-14.

Later on April 22, 2024, TrueCar furnished Katzeff's number to Toyota, and Toyota attempted to contact her via texts and calls. ECF 12, ¶¶ 11-12; *see* ECF 1, ¶¶ 13, 44. Katzeff opted out of any further communications from Toyota by texting it "Stop" the next day. ECF 1, ¶¶ 13-14. Toyota immediately responded that she had "successfully been removed from Toyota of Dartmouth text messages." *Id.* ¶¶ 13, 15. But rather than honor her opt-out request, Toyota initiated

at least eleven unsolicited telemarketing calls to Katzeff between April 24 and July 16, 2024. *Id.* ¶ 16.

Katzeff brought this class action lawsuit in July 2025, asserting two TCPA claims. ECF 1. Count I alleges that Toyota violated 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) by calling her and others over a one-year period while their phone numbers were listed on the national do-not-call registry. *Id.* ¶¶ 61-68. Count II asserts that Toyota violated 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) by placing more than one call to her and others over a one-year period despite their explicit opt-out requests. *Id.* ¶¶ 69-80. Katzeff also seeks to represent a class for Count I comprising people called by Toyota even though their "telephone number had been listed on the National Do Not Call Registry for at least thirty days," and a class for Count II comprising people called after requesting "to not receive future telephone communications" from Toyota. *Id.* ¶ 50.

Toyota moved to compel arbitration in September 2025. ECF 10. Toyota contends that Katzeff is bound by her alleged arbitration agreements with AutoWeb and TrueCar, and that it can enforce those agreements as a third-party beneficiary. *See* ECF 11. After Katzeff opposed Toyota's motion, the Court held a hearing and took the motion under advisement. ECF 17, 26.

## DISCUSSION

The Federal Arbitration Act ("FAA") reflects both "the fundamental principle that arbitration is a matter of contract" and "a liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks omitted). Its main substantive clause states that a "written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Because "arbitration agreements are simply contracts," the "'first principle that underscores all'" Supreme Court precedent interpreting the FAA "'is that [a]rbitration is strictly a

matter of consent.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019)). "As a consequence of the FAA's contract-based philosophy, its liberal policy favoring arbitration is only triggered when the parties actually agreed to arbitrate." *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 174 (1st Cir. 2021) (quotation marks omitted); *see Suski*, 602 U.S. at 145 ("[D]isputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes.").

The party seeking to compel arbitration ordinarily bears the burden of proving "that a valid agreement to arbitrate exists, that [it] is entitled to invoke the arbitration clause, and that the claim asserted comes within the clause's scope." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 60-61 (1st Cir. 2018) (quotation marks omitted).[1] As a threshold matter, Toyota argues that an arbitrator, not this Court, should make these determinations regarding arbitrability. That is so, according to Toyota, because Katzeff's alleged arbitration agreements with AutoWeb and TrueCar both contain delegation clauses. *See* ECF 13-1, at 16 (AutoWeb provision stating that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as other terms and conditions of these Terms of Use"); ECF 14-2, § 2(c) (TrueCar's "agreement to submit all Claims to arbitration includes all disputes or questions about arbitrability").[2] Notwithstanding these clauses, Katzeff can still dispute whether she formed a contract and challenge the validity of the delegation provisions in court. *Toth v. Everly Well, Inc.*, 118 F.4th

---

[1] Motions to compel arbitration are governed by the summary judgment standard. *Air-Con*, 21 F.4th at 174-75. Under that standard, "the court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 175. "If the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." *Id.* (quoting 9 U.S.C. § 4).

[2] A delegation clause is "an agreement to submit to arbitration those issues relating to the scope, validity, and enforceability of an arbitration agreement." *Toth v. Everly Well, Inc.*, 118 F.4th 403, 410 (1st Cir. 2024) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).

403, 410 (1st Cir. 2024) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide."). Toyota must also "'establish its right to enforce the delegation provision[s] as a nonsignatory'" to both agreements. *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 309 (1st Cir. 2025) (emphasis omitted).

State contract law supplies the principles for determining whether a valid arbitration agreement exists and whether Toyota can enforce that agreement as a third-party beneficiary. *See Bekele v. Lyft, Inc.*, 918 F.3d 181, 185 (1st Cir. 2019); *Air-Con*, 21 F.4th at 174. The parties dispute whether Massachusetts or California law applies, with Toyota advocating the former based on the forum with the closest nexus to the case, and Katzeff advocating the latter based on choice-of-law provisions in AutoWeb's and TrueCar's Terms of Service.[3] Logically, this Court cannot, as Katzeff argues, rely on a choice-of-law provision in a putative contract before determining whether that contract has been formed and whether Toyota can enforce the contract as a third-party beneficiary. *See Crean v. Morgan Stanley Smith Barney, LLC*, 652 F. Supp. 3d 171, 179 (D. Mass. 2023) (collecting cases finding that "contractual choice-of-law clauses do not apply to a validity determination"). Instead, the Court must apply Massachusetts choice-of-law principles, because the Commonwealth is the forum state for this lawsuit. *See NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020).

---

[3] The Terms of Service for AutoWeb and TrueCar both contain California choice-of-law provisions. *See* ECF 13-1, at 17 ("These Terms of Use and your use of the AutoWeb Websites are governed by the laws of the State of California, USA."); ECF 14-1, § 2 ("Except as otherwise expressly provided in the TrueCar Arbitration Agreement (which applies the Federal Arbitration Act), the relationship between you and TrueCar are governed by the laws of the State of California without regard to its conflict/choice of law provisions."); *see* ECF 14-2, § 2(f) ("TrueCar and You agree that this Arbitration Agreement shall be construed and interpreted under the Federal Arbitration Act, 9 U.S.C. Section 1, et. seq.").

"Massachusetts follows 'a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.'" *UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 405 n.12 (2019) (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985)). To resolve contractual disputes, Massachusetts is guided by Sections 6 and 188 of the Restatement (Second) of Conflict of Laws (1971). *Bushkin Assocs.*, 393 Mass. at 632. In assessing which state "has the most significant relationship to the transaction and the parties," the Court considers "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(1)-(2). The Court also weighs the seven factors listed in Section 6 of the Restatement. *See id.*; *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass. App. Ct. 492, 496 (2004).[4]

Here, Massachusetts has the most significant relationship to Katzeff and Toyota. Both parties are located in Massachusetts, Toyota's challenged calls to Katzeff occurred in the Commonwealth, and Katzeff ostensibly visited the websites of AutoWeb and TrueCar while she resided in Massachusetts. ECF 1, ¶¶ 7-8, 10-11; *see Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 294 n.4 (D. Mass. 2016) (applying Massachusetts law despite California choice-of-law provision), *aff'd*, 918 F.3d 181 (1st Cir. 2019). The Court will, accordingly, apply Massachusetts law.

---

[4] Those factors are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

## I.      **<u>Contract Formation.</u>**

Toyota must first prove that a valid arbitration agreement exists. *See Rivera-Colón v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 207 (1st Cir. 2019). Under Massachusetts contract law, as "the party seeking to enforce an agreement to arbitrate," Toyota "must demonstrate both offer and acceptance." *Good v. Uber Techs., Inc.*, 494 Mass. 116, 126 (2024). To show that an allegedly nonnegotiable and standardized contract "was formed, 'there must be both . . . notice of the terms [of the contractual offer] and a reasonable manifestation of assent to those terms [so as to constitute acceptance of the offer].'" *Id.* (quoting *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572 (2021)).

### A.      <u>Reasonable Notice.</u>

Since Katzeff lacked actual notice of either arbitration agreement from AutoWeb and TrueCar,[5] Toyota must demonstrate reasonable notice of the companies' terms. *Id.* at 127. Such reasonable notice may exist "'so long as [Katzeff] had an adequate opportunity'" to review the terms. *Id.* (quoting *Archer v. Grubhub, Inc.*, 490 Mass. 352, 361 (2022)). To determine whether she had an adequate opportunity, the Court evaluates the totality of the circumstances, including (1) "'the nature, including the size, of the transaction,'" (2) "'the interface by which the terms are being communicated,'" (3) "'the form of the contract,'" and (4) "'whether the notice conveys the full scope of the terms and conditions.'" *Id.* at 128 (quoting *Kauders*, 486 Mass. at 573). Reasonable notice does not exist unless AutoWeb or TrueCar notified Katzeff that there *are*

---

[5] Actual notice exists where the offeree has actually reviewed the terms or where the offeree was required to "'interact with the terms before agreeing to them,' including by scrolling through them." *Good*, 494 Mass. at 127 (quoting *Kauders*, 486 Mass. at 572).

binding terms, including a mandatory arbitration clause, and Katzeff had an opportunity to review those terms. *See Good*, 494 Mass. at 128; *Kauders*, 486 Mass. at 573.

Toyota fails to establish that Katzeff had reasonable notice of AutoWeb's terms. AutoWeb Senior Vice President of Legal and Compliance Davtyan attests that Katzeff was "presented with a TCPA consent statement that included a hyperlink to the Company's Terms of Use" and "assented to the Terms of Use, including the arbitration provision, by clicking the submit button the lead form." ECF 13, ¶¶ 4, 6. But neither she nor Toyota provide a screenshot of AutoWeb's webpage that Katzeff saw on April 18, 2024. The screenshot offered by Katzeff is not an adequate substitute because it is from October 2025. *See* ECF 17-1, ¶ 6. Katzeff also does not recall the disclosure or form that AutoWeb presented online or whether she submitted her cellphone number. *Id.* ¶¶ 3-5. Without evidence showing what Katzeff saw when she encountered AutoWeb's Terms of Use, the Court cannot conduct the requisite inquiry into the "totality of the circumstances" surrounding AutoWeb's notice, including, in particular, the interface by which AutoWeb's terms were communicated. *Good*, 494 Mass. at 136.

In contrast, Toyota has shown that Katzeff had reasonable notice of TrueCar's terms based on the factors identified in *Good* and *Kauders*. First, in analyzing the nature and size of the transaction, the Court considers "the perspective of 'reasonable people in the position of the parties.'" *Good*, 494 Mass. at 128-29 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)). The transaction here involves a consumer shopping for cars online. A reasonable consumer in that position is unlikely to expect to be asked to enter into a contract when submitting her phone number to obtain prices of vehicles, particularly where there is no evidence that consumers pay for that service. *Cf. id.* at 129 (a reasonable consumer "may not have expected to be entering a contract at all" when using a ride-sharing app to request a ride); *Kauders*, 486 Mass. at 575 (same where

the consumer was purchasing a credit score). Under the circumstances, the first factor weighs against reasonable notice.

The remaining factors, however, support the conclusion that Katzeff had reasonable notice of TrueCar's Terms of Service. The second and third factors concern "whether the interface presented the terms in a manner that to a reasonable person in the user's circumstance would 'appear to be [a] contract.'" *Good*, 494 Mass. at 130 (quoting *Kauders*, 486 Mass. at 573). The webpage here expressly communicated that TrueCar was presenting its terms. The phrase "Terms of Service" appears twice, and both times it is underlined and hyperlinked. ECF 14, ¶¶ 4, 8. The webpage also made clear that by checking the box, Katzeff was "accept[ing] TrueCar's Terms of Service and Privacy Policy." *Id.* The link to those terms "was not buried on a cluttered screen," and "[n]othing distracted from the interface's singular focus on providing notice of, and obtaining assent to, the terms of [service], along with acknowledgment of the privacy [policy]." *Good*, 494 Mass. at 131-32. By clicking the first hyperlink, Katzeff would have been brought to TrueCar's Terms of Service. ECF 14, ¶ 4. The first section of those terms is titled "**ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO BRING COLLECTIVE ACTION**" and provides that the user "and TrueCar agree to final and binding arbitration of all Claims . . . before the American Arbitration Association pursuant to the written Arbitration Agreement," which is hyperlinked to the actual agreement. ECF 14-1, § 1; ECF 14, ¶ 9. It also instructs users to "PLEASE READ THIS ARBITRATION AGREEMENT CAREFULLY" because "IT AFFECTS YOUR RIGHTS." ECF 14-1, § 1. Katzeff objects that she "would not have known [she] was consenting to be bound by TrueCar's Terms of Service or to the arbitration provisions therein." ECF 17-1, ¶ 13. Whether the notice is sufficient, however, "'is an objective test.'" *Good*, 494 Mass. at 130 (quoting *Archer*, 490 Mass. at 362). And based on "the language used to notify the user of the

11

terms, the prominence with which the hyperlink . . . to the terms was displayed, and the clarity and extensiveness of the process to access the terms," the webpage "'would have provided a reasonably prudent [user] notice of the [terms being offered, including the arbitration provision].'" *Id.* (quoting *Archer*, 490 Mass. at 362).

Finally, the Court considers whether the screen conveyed the full scope of the terms and conditions. As discussed, TrueCar's webpage provided a hyperlink to its Terms of Service, which in turn included a hyperlink to the arbitration agreement containing its full terms and conditions. Under the totality of the circumstances, TrueCar conveyed reasonable notice to Katzeff because, notwithstanding the modest nature of the commercial transaction, the webpage "made those terms readily available," gave her the chance to review them, and notified her that she would be bound by them. *Id.* at 139.

B.     Reasonable Manifestation of Assent.

Toyota must further demonstrate that Katzeff reasonably assented to TrueCar's terms. To determine whether Katzeff assented to those terms, the Court "'consider[s] the specific actions required to manifest assent.'" *Id.* at 142 (quoting *Kauders*, 486 Mass. at 573-74). "'The connection between the action [that manifests assent] and the terms [should be] direct [and] unambiguous.'" *Id.* (quoting *Kauders*, 486 Mass. at 580).

As excerpted above, TrueCar's webpage required Katzeff to check the box "accept[ing] TrueCar's Terms of Service and Privacy Policy," both of which were hyperlinked, before she could click "Next." *Id.* ¶¶ 4-5, 8. While Katzeff cannot recall having submitted her cellphone number, she does not dispute having checked the box. ECF 17-1, ¶ 10. TrueCar Vice President of Technology Shindle also attests that Katzeff must have checked the box when she "request[ed] pricing information from participating dealers for a new vehicle on April 22, 2024," because "it is

impossible for an individual to submit a lead and request pricing information from participating dealers through the TrueCar platform, without first agreeing to the TrueCar Terms of Service." ECF 14, ¶¶ 5-6. Massachusetts courts "'regularly enforc[e]'" such "'clickwrap'" contracts where, as here, "a user is 'required to expressly and affirmatively manifest assent to an online agreement by clicking or checking a box that states that the user agrees to the terms and conditions.'" *Good*, 494 Mass. at 143 (quoting *Kauders*, 486 Mass. at 574). "This connection between checking the box and indicating assent to the terms was express and unambiguous, particularly as [Katzeff] could not proceed past the screen without so indicating [her] assent." *Id.*

Katzeff again protests that, based on the disclosure language, she would not have known that she was assenting to TrueCar's Terms of Service or its arbitration agreement. ECF 17-1, ¶ 13. But "clickwrap contracts are the 'clearest manifestations of assent' because they require users to affirmatively signal their acceptance of the attached terms." *Toth*, 118 F.4th at 413 (quoting *Kauders*, 486 Mass. at 574). Since Katzeff had "a duty to read the terms" of TrueCar's Terms of Service, *Good*, 494 Mass. at 141, she is "bound by" those terms "regardless of whether [she] actually read" them, *Kauders*, 486 Mass. at 572 (citation omitted); *accord Archer*, 490 Mass. at 362. In sum, Katzeff formed an arbitration agreement with TrueCar but not AutoWeb.

## II.    <u>Contract Validity.</u>

Toyota must also demonstrate that Katzeff "agreed to arbitrate issues of arbitrability, including the validity and scope of the arbitration agreement." *Toth*, 118 F.4th at 414. The first section of TrueCar's operative Terms of Service states that Katzeff and TrueCar "agree to final and binding arbitration of all Claims . . . before the American Arbitration Association pursuant to the written <u>Arbitration Agreement</u>," which is hyperlinked. ECF 14-1, § 1; ECF 14, ¶ 9. As relevant here, the agreement in effect in April 2024 provided that "any and all Claims . . . shall be submitted

13

to final, binding, and confidential Arbitration before the American Arbitration Association ('AAA') in accordance with the AAA Commercial Arbitration Rules . . . and AAA Consumer Arbitration Rules . . . , as applicable to a particular dispute," including "all disputes or questions about arbitrability." ECF 14-2, §§ 2(b), (c); *see id.* § 2(k) ("All issues are for the Arbitrator to decide, including all issues of arbitrability such as the scope and enforceability of the Arbitration Agreement."); ECF 14, ¶ 10. The "incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator." *Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 29 (1st Cir. 2021). Those rules, like TrueCar's arbitration agreement, "provide that the arbitrator must hear any 'objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.'" *Toth*, 118 F.4th at 414 (quoting Com. Arb. Rules & Mediation Procs. R-7(a) (2013)).

Katzeff argues that TrueCar's arbitration agreement is unconscionable and therefore unenforceable against her. Massachusetts courts apply "a lower threshold for finding unconscionability" to contracts of adhesion, such as the clickwrap agreement at issue here. *Good*, 494 Mass. at 144 n.41. To meet that threshold, Katzeff "must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015) (quotation marks omitted). Katzeff fails to satisfy this standard because she has not shown that the delegation provision itself is either procedurally or substantively unconscionable. *See Toth*, 118 F.4th at 414-16. Her arguments concern the unconscionability of TrueCar's arbitration agreement as a whole, not the delegation clause specifically. Those arguments are, accordingly, for the arbitrator to decide.

### III.    **Third-Party Beneficiary.**

Having established the existence of a valid arbitration agreement between TrueCar and Katzeff, Toyota must finally show that it can enforce the agreement as a third-party beneficiary. The Supreme Judicial Court "has acknowledged six theories under which a nonsignatory may enforce a contract, such as an arbitration agreement, against a signatory." *Landry v. Transworld Sys. Inc.*, 485 Mass. 334, 339 (2020). Under the third-party beneficiary theory invoked here, "a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to 'clea[r] and definit[e]' evidence of the parties' intent that it benefit from the provision." *Id.* at 342 (quoting *Constantino v. Frechette*, 73 Mass. App. Ct. 352, 356 (2008)). "For evidence of intent to include [Toyota] as a third-party beneficiary to be considered 'clear and definite,' there must, at a minimum, be no ambiguity in the arbitration provision as to whether [Toyota] could enforce it." *Id.*

Toyota proffers clear and definite evidence of the parties' intent to establish that it is entitled to enforce the TrueCar's arbitration provision as a third-party beneficiary. The operative agreement provides that Katzeff and TrueCar "agree that Participating Dealers . . . are intended to be third party beneficiaries to this Arbitration Agreement and that the terms of [the] Agreement will also inure to the benefit of Participating Dealers." ECF 14-2, § 5. "This means," the agreement continues, "that—in addition to [Katzeff] and TrueCar—Participating Dealers . . . will be able to enforce this Agreement in the event of a dispute between [Katzeff] and one of TrueCar's participating Dealers." *Id.* The agreement defines "Participating Dealers" as "any new and/or used automobile dealer that participates in the TrueCar network." *Id.* § 7.

Rejecting the clarity of the text of the agreement, Katzeff asserts that she would not have "expected to be bound by an arbitration agreement between [her]self and Toyota." ECF 17-1, ¶ 14.

15

While the agreement does not expressly reference Toyota, the record supports Toyota's argument that it is a Participating Dealer in the TrueCar network. Toyota's General Manager Zammito attests that Toyota "operates a retail motor vehicle dealership selling and leasing new and used motor vehicles" and "is a party to [an] agreemen[t] with . . . TrueCar." ECF 12, ¶¶ 3, 7. He also understands that "all consumers who submit sales leads through . . . TrueCar must affirmatively consent to [that] site's Terms of Use and/or Terms of Service and consent to be contacted by Toyota." *Id.* ¶ 8. TrueCar Vice President of Technology Shindle similarly avers that "it is impossible for an individual to submit a lead and request pricing information from participating dealers through the TrueCar platform, without first agreeing to the TrueCar Terms of Service," and that "Katzeff submitted leads requesting pricing information from participating dealers for a new vehicle on April 22, 2024." ECF 14, ¶¶ 5-6. TrueCar, in turn, provided her contact information to Toyota that same day. ECF 12, ¶ 11. This record makes clear that, as a "new and/or used automobile dealer that participates in the TrueCar network," Toyota is a "Participating Deale[r]" as defined in TrueCar's arbitration provision. ECF 14-2, §§ 5, 7.

Katzeff further argues that, absent a list of all of TrueCar's Participating Dealers in the arbitration agreement itself, she would not have intended for Toyota of Dartmouth specifically to be able to enforce the agreement as a third-party beneficiary. Toyota disputes that such a precise list is required. In Toyota's view, it is sufficient for the contract to identify the category of entities that may enforce the agreement as third-party beneficiaries. Toyota has the better argument. In *Constantino v. Frechette*, the Appeals Court considered whether nurses employed by a nursing home could enforce as third-party beneficiaries an arbitration agreement between the nursing home and a patient. 73 Mass. App. Ct. 352, 356-57 (2008). The Court ruled that the nurses could not enforce the agreement because it did not contain a provision informing "patients that the arbitration

provision was intended to inure to the benefit of individual nurses as well." *Id.* at 356. Had the nursing home wished to give its nurses an enforceable right as third-party beneficiaries, the Court explained, it could have included language in the contract "establishing that the agreement was intended to inure to the benefit of the employees, or other appropriate language." *Id.* at 357. Further, "each and every agent of the corporation" would not have been "required to sign the agreement in order to be covered." *Id.* Rather, the nurses would have had an enforceable right as third-party beneficiaries if the agreement expressly covered "employees." *Id.* In so ruling, the Appeals Court distinguished an earlier case in which the Supreme Judicial Court held that nurses *could* enforce an arbitration agreement between a nursing home and a patient, where the contract "expressly stated that the parties intended that the agreement would inure to the benefit of the agents, employees, and servants of the nursing home." *Id.* (discussing *Miller v. Cotter*, 448 Mass. 671, 681-84 (2007)). That agreement listed categories of third-party beneficiaries with enforceable rights—agents, employees, and servants—but nurses did not need to be listed by name in order to enjoy third-party beneficiary status. *Id.*

This Court has reached a similar conclusion. In *Gagne v. Stallion Express, LLC*, the Court held that a nonsignatory could enforce an arbitration agreement on a third-party beneficiary theory. No. 22-cv-40008-TSH, 2022 WL-17658121, at *3-4 (D. Mass. Sept. 15, 2022), *report and recommendation adopted*, ECF 41 (D. Mass. Sept. 26, 2022) (applying federal common law). The operative agreement expressly provided that "Logistics Providers" were intended third-party beneficiaries of an arbitration agreement between a worker and a payroll administrator. *Id.* After determining that the nonsignatory defendant was a logistics provider, the Court concluded that the defendant had demonstrated with "special clarity" that the contracting parties intended to give it the right to enforce the arbitration agreement as a third-party beneficiary. *Id.* at *4 (quotation marks

omitted). It was sufficient that the defendant fell into the category of logistics providers; the law did not require the arbitration agreement to list each logistics provider by name in order to create an enforceable right. *See id.*

So too here. The arbitration agreement states directly that a category of entities—Participating Dealers—is entitled to enforce the agreement as third-party beneficiaries. ECF 14-2, § 5. That language constitutes clear and definite evidence of the contracting parties' intent that when a business is a Participating Dealer, it "will be able to enforce th[e] Agreement in the event of a dispute." *Id.* As a Participating Dealer, Toyota is thus a third-party beneficiary entitled to enforce TrueCar's arbitration provision against Katzeff.

## CONCLUSION AND ORDER

For the foregoing reasons, Toyota's motion to compel arbitration, ECF 10, is GRANTED. This case will be STAYED pending arbitration.[6] The parties are ORDERED to file a joint status report within 14 days of the conclusion of the arbitration, or by December 5, 2026, whichever is earlier.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: June 4, 2026                           UNITED STATES DISTRICT JUDGE

---

[6] Toyota has requested that this action be stayed pending arbitration. When, as here, "a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3.